EDWARD M. ROBBINS (SBN 82696)
HOCHMAN, SALKIN, RETTIG, TOSCHER
& PEREZ, P.C.
9150 Wilshire Blvd., Suite 300
Beverly Hills, CA 90212
Telephone (310) 281-3247
Facsimile (310) 859-5129
Email: *edr@taxlitigator.com*

Attorney for Defendant
MASUD SARSHAR

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MASUD SARSHAR,<br><br>Defendant. | Case No. CR 16-527 PSG<br><br>**DEFENDANT'S POSITION RE: SENTENCING, WITH EXHIBITS**<br><br>Sentencing Date: March 13, 2017<br>Time: 9:00 a.m.<br>Court: Hon. Philip S. Gutierrez |

Defendant MASUD SARSHAR, through counsel, hereby submits his Position with Respect to Sentencing, with Exhibits. Defendant reserves the opportunity to make additional comments through counsel at the sentencing hearing in this matter.

Date: March 3, 2017

Respectfully submitted:

By /s/Edward M. Robbins, Jr.
HOCHMAN, SALKIN, RETTIG, TOSCHER & PEREZ, P.C.

Attorney for Defendant
MASUD SARSHAR

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. ACCEPTANCE OF RESPONSIBILITY. . . . . . . . . . . . . . . . . . . . . 2

III. COMMENTS ON THE ADVISORY GUIDELINES AND SENTENCING RECOMMENDATIONS. . . . . . . . . . . . . . . . . . . 2

IV. DEFENDANT'S HISTORY AND CHARACTERISTICS SUPPORT THE REQUESTED SERVICE. . . . . . . . . . . . . . . . . . . 3

- A. Family Background and Childhood in Iran . . . . . . . . . . . . 4
- B. Move to the United States/Military School. . . . . . . . . . . . . 6
- C. Early Work Experience in Los Angeles. . . . . . . . . . . . . . . . 7
- D. Apparel Limited, Inc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
- E. Significant Relationships/Community Involvement . . . . . . 12

V. PERSONAL STRUGGLES WITH ALCOHOL. . . . . . . . . . . . . . . 18

VI. BACKGROUND OF SSECRET FOREIGN BANK ACCOUNTANT CASES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

- A. IRS Offshore Voluntary Disclosure Initiatives. . . . . . . . . . . 18
- B. Offshore Criminal Tax Cases from 2008 to the Present . . . 20
  1. The massive FBAR penalty insisted on by the government in its plea deals results in a counterbalancing reduction in jail time. . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
  2. A Guidelines sentence would create disparity in the nationwide sentencing treatment of similar secret foreign bank account holders. . . . . . . . . . . . . . . 23
  3. A Guidelines sentence would create disparity in the treatment of undisclosed foreign bank account holders processed under the OVDI and OVDP. . . . . . . . 24

4. A Guidelines sentence would create disparity in the local sentencing treatment of similar undisclosed foreign bank account holders. . . . . . . . . . . . . 24

VII. CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

Gall v. United States, 552 U.S. 38 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . 5
Koon v. United States, 5189 U.S. 81 (1996) . . . . . . . . . . . . . . . . . . . . . . . . 5
Pepper v. United States, 562 U.S. ___ (2011) . . . . . . . . . . . . . . . . . . . . . . . 5
United States v. Olenicoff, 07-cr-227 (CDCAL 2008) . . . . . . . . . . . . . . . .
United States v. Warener, 792 F.3d 847 (7th Cir. 2015) . . . . . . . . . . . . . . . 23
Williams v. People of the State of New York,
337 U.S. 241 (1949) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

## RULES AND REGULATIONS

Federal Rule of Criminal Procedure:
§11(c)(1)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 29

## STATUTORY PROVISIONS

18 U.S.C. §371 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 23
18 U.S.C. §3661 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
18 U.S.C. §3553(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 29
26 U.S.C. §7201 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
26 U.S.C. §7206(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
26 U.S.C. §7212(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
31 U.S.C. §5314 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
31 U.S.C. §5322(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

## MISCELLANEOUS

U.S.S.G. §5K1.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
U.S.S.G. §2T1.1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
U.S.S.G. §2T1.1(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
U.S.S.G. §§ 3E1.1(a) & (b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Asher Rubinstein, Bringing A Foreigni Bank Account Into
Tax Compliance, 64 Tax Notes Int'l 363 (Oct. 31, 2011) . . . . . . . 22

# I. INTRODUCTION

On July 30, 2016, Defendant Masud Sarshar, age 52, pleaded guilty to one count of conspiracy to defraud the United States [in violation of 18 U.S.C. Section 371], and one count of corruptly obstructing and impeding the due administration of the Internal Revenue Laws [in violation of 26 U.S.C. Section 7212 (a)]. ***The Plea Agreement was entered into pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C).*** At the time of the offense conduct, Mr. Sarshar was the owner of Apparel Unlimited, Inc., an apparel company. The charge arose from Mr. Sarshar maintaining off-shore bank accounts which he did not declare to the IRS. Defendant deposited into the off-shore bank accounts taxable income he did not report to the IRS. The defendant also received taxable interest income from the offshore accounts that he did not report.

In the Presentence Investigation Report (hereinafter PSR), the Probation Officer notes that pursuant to the Rule 11(c)(1)(C) binding plea agreement, the parties stipulated to a low end sentence of 24 months of imprisonment, and stated that the "offense level calculations in this report are consistent with the plea agreement."

Mr. Sarshar has accepted full responsibility for his offense. He recognizes and regrets the decisions that led him to take the actions which bring him before the Court, and he is committed to make amends and correct the mistakes he made.

An examination of Mr. Sarshar's personal history reveals a compassionate, industrious, and talented individual who has worked hard since he was in his teens to achieve success in his chosen field of endeavor. He has a reputation for intelligence, kindness, generosity, and integrity which is epitomized by the tremendous work he has done for children and young adults through his volunteer work and donations to Chabad. He now stands before the Court, to his unending regret and shame, having irreparably damaged both his professional standing and his personal reputation in his community.

On the above grounds, Defendant Sarshar, through counsel, respectfully requests the Court to accept the Rule 11(c)(1)(C) binding plea agreement and sentence him to a 24 month term of imprisonment. Such a sentence would be "sufficient but not greater than necessary" and would be in accordance with the sentencing factors set forth at 18 U.S.C. §3553(a).

## II.

## ACCEPTANCE OF RESPONSIBILITY

Mr. Sarshar has expressed remorse and contrition for having broken the law. In his letter to the Court (appended), he states:

> …I am deeply sorry for my actions which were selfish and unlawful. … I respect the judiciary process and understand its purpose. I realize that actions have consequences and am prepared to face the consequences imposed by the Court. I have learned from this mistake, and I wish only make amends to the government and society as best I can through restitution and time spent in custody, then put this behind me and get back to work to contribute to my family and my community.

## III.

## COMMENTS ON THE ADVISORY GUIDELINES AND SENTENCING RECOMMENDATIONS

In the Plea Agreement, the parties stipulate to a total offense level of 23, which at Criminal History Category I, corresponds to a sentencing range of 46 to 57 months. The calculations are derived from a base offense level of 24 [U.S.S.G. §2T1.1]; a 2-level increase for sophisticated means [U.S.S.G. §2T1.1(b)(2)]; and a 3-level reduction for acceptance of responsibility [U.S.S.G. §§3E1.1(a)&(b)].

In its Letter of Recommendation, the U.S. Probation Office concurs with the parties' 24 month recommended sentence [See Probation Officer's Letter of Recommendation, P. 5]. The Probation Officer writes:

> Giving deference to the parties' stipulations in the binding pela agreement, combined with Sarshar's commitment to completely rectifying the financial impact of the offense and his low risk of recidivism, the Probation Officer agrees with the parties' stipulation to a sentence of 24 months. The recommended sentence will ensure that Sarshar is sufficiently punished, but will not be greater than necessary to comply with the purposes of sentencing.

## IV.

## DEFENDANT'S HISTORY AND CHARACTERISTICS SUPPORT THE REQUESTED SENTENCE

In Gall v. United States, 552 U.S. 38 (2007), the U.S. Supreme Court advised that in addition to consulting the Guidelines, the "district court should…consider all the 3533(a) factors to determine whether they support the sentence requested by a party. In so doing, [the court] may not presume that the Guidelines range is reasonable. [The court] must make an individualized assessment based on the facts presented." Gall at 596-597.

Furthermore, the Supreme Court has upheld that "[u]nderlying this tradition is the principle that 'the punishment should fit the offender and not merely the crime.'" Pepper v. United States, 562 U.S. __ (2011), quoting Koon v. United States, 518 U.S. 81, 113 (1996), quoting Williams v. People of the State of New York, 337 U.S. 241, 247 (1949). The Supreme Court has "emphasized that [h]ighly relevant – if not essential – to the selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics."

The following social history information is presented in the spirit of 18 U.S.C. §3661, which sets forth, "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."

A. **Family Background and Childhood in Iran**

Masud Sarshar was born on December 1, 1964, in Tehran, Iran. He is the second of five children of Mansour Sarshar and Maryam Toofer Sarshar. Mansour Sarshar worked in the garment industry. He owned a factory and a retail outlet, and specialized in high quality men's suits. His clientele consisted largely of senior military and civilian officials in the government of the Shah, Mohammed Reza Pahlavi. His family was Jewish and lived in a neighborhood not far from the U.S. Embassy and Tehran University.

Masud's mother Maryam was a full-time housewife and mother. Masud was the only boy among five siblings. He has one older sister Mojgan, 54, and three younger sisters: Marjan, 50; Mashid, 48; and Maggie, 39.

Masud's father Mansour was a self-made man. The son of a bus driver, he dropped out of school at age 12 taking whatever odd jobs came his way. In his letter to the Court, Masud's cousin, Sep Sarshar, provides interesting background into the plight of the Jewish minority in Iran:

> Masud's father, Mansur, was one of eight children born to Josef and Tooba Sarshar. The family had resided for many generations in the Jewish ghetto of Isfahan. Josef Sarshar was a bus driver, and as it was customary in those days, Tooba was a homemaker. Jews had resided in the Persian Empire going back 3,000 years and had seen their social status ebb and flow under the various rulers. Following the Arab invasion and institution of Islam as the official state

> religion, Persian Jews became second-class citizens and many of their rights were taken away…
>
> In the 1960's and 1970's, driven by increasing oil revenues, Iran was undergoing a major economic revival… By th[at] time, the Sarshar family had made the move from Isfahan to Tehran and all family members had become successful businessmen… That said, none of them ever forget their humble and traumatic beginnings.

In Tehran, Mansour eventually gravitated toward the clothing business, discovered that he had an eye for fashion, and ultimately manufactured and sold suits. Mansour was known for his good taste in fine menswear and his humble manner with his demanding, well-situated clients.

At home, however, Mansour was anything but humble. He was a perfectionist and a sometimes violent alcoholic. As the only son, Masud was the center of attention for his father which came at a considerable cost. He was often the target of physical and verbal abuse, with his father constantly claiming to be disappointed in him, and calling him a "sissy." To rationalize his father's abusive behavior, Masud interpreted his father's actions as intended to push him hard and toughen him up.

Masud's father argued frequently with his mother, and sometimes physically abused her. Masud tried to protect his mother which only led to additional beatings and more strife with his father.

Masud began school at age seven, as was customary in Tehran. He attended a Hebrew school, Jaim Suleiman, through the fifth grade, followed by Amagan Tarbiet for middle school. He was a conscientious student who earned good grades.

Growing up in a neighborhood populated with many military families, Masud looked up to the officers, in part because they seemed so different from his father --

respectable, honorable, and disciplined. By the time he was 14, Masud had set his sights on a military career.

B. **Move to the United States/Military School**

It was common practice for Iranian parents with enough means to send their children to study abroad. Masud explored going to the United States to attend military boarding school. His grandfather and mother supported the idea, and although his father vacillated, he finally agreed. Masud came to the U.S. at the beginning of the 9th grade and enrolled at the Florida Air Academy in Melbourne, Florida. He spoke no English upon his arrival, but facing "sink or swim" circumstances, he learned the language quickly.

Masud's high school years coincided with the Iranian fundamentalist revolution of 1979 and the fall of the Shah. Prior to the unrest, Masud's goal was to complete military school, enroll in West Point, become an officer, and return to Iran to become a fighter pilot in the Shah's Air Force. That path was no longer feasible after the revolution, at least not for Jewish teenagers such as Masud. And due to his family's association with the deposed Shah, combined with their Jewish ethnicity, Masud could not return to Iran even as his family was exploring leaving the country.

In 1981, at age 16, Masud dropped out of military school and moved in with his college-age cousins, Albert and Manocher Sarshar, in San Luis Obispo, California. He enrolled in high school there, and took business and advertising courses at Cuesta Community College. He also applied for political asylum, beginning the long and arduous process which led first to a Green Card and, eventually, U.S. citizenship. Meanwhile, his family was still in Iran. With little money available from family sources, Masud joined the workforce, taking whatever jobs he could find, whether it was washing the hulls of boats or rinsing dishes in restaurants.

Although Masud never completed military school, it was a positive experience. He had worked out regularly and was in much better physical condition than he had

been back in Iran. He had also developed self-discipline and had gained a working knowledge of the martial arts. Friends and relatives remarked on his improved appearance and demeanor. Perhaps most importantly, Masud thought of himself as a strong, disciplined individual with the ability to make his way in the business world.

C. **Early Work Experience in Los Angeles**

In 1983, Masud relocated from San Luis Obispo to Los Angeles where he moved in with his girlfriend Gio, who was a USC student. He took various entry level jobs, saved money, and then approached his paternal uncle, Parvis Sarshar, who owned a clothing store in downtown Los Angeles at Olympic and Santee. Parvis agreed to rent Masud space in front of the store where he set up and ran a hot dog stand. Soon he was also working for Parvis as a translator, and would accompany him to different warehouses to buy closeout items.

Between 1982 and 1985, Masud's sisters escaped one by one from Iran by way of Austria, and make their way to the U.S., followed by their mother a few months later. At first his sisters lived with Masud in an apartment on Robertson Boulevard. When their mother arrived, the whole family except for Mansour moved to an apartment in Marina Del Rey. Masud took on the role of principal breadwinner for his reassembled family.

Masud was working by now as a buyer at his uncle's company, where he earned $1500 a month, modest wages considering the significant job responsibility he had taken on. Now that he had the large extended family to support, he went to his uncle and requested a higher salary. Parvis refused, and Masud resigned, after which Parvis's business soon faltered. Masud arranged for a loan to purchase the store, pay for the merchandise, and start his own enterprise, Apparel Limited. His experience purchasing closeout product was a huge help.

D. **Apparel Limited, Inc.**

Not long after buying the company, when he was still just twenty-three years old, Masud moved into manufacturing. He rented a warehouse next to a parking lot

at Santee and Olympic and started Apparel Limited, Inc. The company would buy leggings and T-shirts, tie-dye them in various colors, and then re-sell them to wholesalers. Masud started with two customers but quickly found more. He then hired manufacturing representatives to sell his product throughout the United States. They expanded the product line to include hand-painted tee-shirts and the company thrived.

In the mid-1980's, not long after Apparel Limited had gotten off the ground, Masud's father arrived in the U.S. With typical generosity, Masud opened a store for him and bought a house in Glendale where Mansour and Masud's mother set up housekeeping.

Around this time, competition from Asia created turmoil in the apparel industry. Asian manufacturers undercut the American domestic market dramatically. Masud's business model was at first disrupted, then damaged irreparably. Without declaring bankruptcy, he shuttered the company and regrouped, searching for a new business model and new product. It was a tough time and as he slowly worked through his capital, Masud recalls experimenting with up to ten new product lines without success.

During what he describes as the lowest ebb of this cycle, Masud hit upon the idea that would create a business turnaround. He took a pair of Dickie's white bib work overalls and dyed them using a "double-dye" process that transformed the white, coarse material into vibrant colors with a softer and more appealing texture. He focus-tested the prototypes and received very positive feedback. He then approached the Dickie's corporation, and built a relationship buying product from them and transforming it, then placing the "Dickie's Girl" products in new locations. For good measure, he added a line of tee-shirts and jackets. After proving the validity of the concept, he obtained status as a Jr. Licensee. Sales increased steadily and Masud's business prospered over the next 15 years.

Apparel Limited's period of prosperity ended when Dickie's began manufacturing its own products that competed directly with Masud's line. After several years of steady decline, Masud shut his company down and by early 2015, he was out of business. Despite the periodic ups and downs of the business world, Masud has always treated his employees with the same care and consideration he has provided to his family.

Carol Wehling, who has known Masud for 20 years and worked for him, comments in her letter:

> He was my employer I was fortunate to be his Sales Manager then later he personally promoted me for my hard work to VP. . . I have experienced many employers and owners of companies before. I can honestly say Masud was one of a small few who always consistently treated me with respect, dignity, and most of all one of the most loyal men I have ever known. . . It wasn't just me it was numerous coworkers too who were given opportunity after opportunity to work in his successful company. He never treated me poorly his heart is huge and giving and I could always count on him. . . He not only employed hundreds of people but the way he cared is something I'll never forget. I will never forget him telling me one day in the conference room "I am responsible for every employee I have here". I will never forget his torment and struggle over the increase in Health Care premiums for his employees and how much that was costing the Company but he kept it going anyway for us. He didn't have to but he cared and he did. He rewarded us handsomely if we excelled with year-end bonuses, he didn't have to but he did.

> He took care of his employees……he felt this deep obligation and gratitude to his staff. In fact he couldn't even fire a bad employee his heart is golden. …I also know he took care of some employees family problems personally financially and behind the scenes, I know he paid for one families funeral and helped employees out when they got into a bind.

Tim Radecki worked for Masud for more than a decade. He writes to the Court:

> …Masud was always a very compassionate and fair employer to me… I'm very appreciative to Masud for giving me confidence in my abilities by allowing me to learn many facets of the apparel industry. This opportunity to grow within his company eventually led me to running the warehouse operations.
>
> With a warehouse staff of over 30 employees, we were successful because we were able to retain good employees. I believe a main factor in tis…was Masud's show of appreciation toward his employees. This included health insurance benefits…, employee discounts on merchandise, lunches on special occasions, as well as office holiday parties. The low turnover rate of employees leads me to believe they felt similarly toward Masud as I did.

Hubert Guez, a highly successful apparel industry business owner, observes:

> I have had many personal interactions with Mr. Sarshar and I came to realize that his thinking was not selfish and he

> was always thinking in terms of teamwork and team building, he insisted his colleagues be partners in the projects we were discussing at the time… I live very close to Mr. Sarshar and had many occasions to sit with him before and after his guilty plea. I know that he is devastated by this situation and has accepted personal responsibility in the matter. He is ready to assume the consequences of his action... I believe him to be sincere… As evidence of my respect and trust for Mr. Sarshar, I can offer no higher expression of confidence that the fact that I would offer immediately to Mr. Sarshar a position in our company… I would even consider building a separate division for and around Mr. Sarshar…

Iqbal Hassan, a long-time business associate, writes:

> . . . Masud had many financial ups and downs but no matter what his financial status, he paid all his obligations and made sure that his employees were taken care of, often at his own expense. He remained loyal to his friends, family, customers, vendors, and employees. Through his loyalty to those around him, he helped others establish businesses, careers, families, households by offering not only financial assistance but positive encouragement and support. He has enriched the lives of countless individuals from all walks of life. I am reminded of a homeless man that lived out of a trailer near Masud's warehouse in Boyle Heights who, upon hearing of Masud's incarceration, had tears in his eyes because he recalled the first time Masud met him, Masud not only gave him work, but also gave him a hug

> when most people wouldn't even shake the homeless man's hands. Masud was and always will be a visionary that thinks "outside the box." More than fifteen years ago he hired and paid graffiti taggers to paint murals on his buildings so that they could express their artistic talent rather than create neighborhood blight.

E. **Significant Relationships/Community Involvement**

In 1987, Masud began a relationship with Diana Brieto. Diana gave birth to their daughter Mia two years later. Although Masud and Diana gradually grew apart, their separation was amicable and they agreed to share custody of Mia. In addition, Masud continued to support Mia and Diana, as well as his mother, his sisters, and other family members. Mia currently resides with Masud's mother Maryam in Marina Del Rey.

In 1999, Masud moved into his current residence in Malibu, California. One year later, he met his significant other, Keilani Reinhardt. Leilani gave birth to their son Mio in 2008.

Masud's niece, Bebegol Lari is studying Business Administration at USC. Ms. Lari writes to the Court:

> Since the day I was born, Masud has been one of the most prominent people in helping develop my character and shaping me into the person I am today. Beyond being a successful businessman, father to two incredible children, loving son to his mother, and trustworthy brother to his four sister, Masud was a role model to me growing up. He taught me to be…determined, brave, and to never give up… I often visited Masud at work when I was a child and my memories at his office were some of the fondest of my childhood. His employees were always cheerful and happy

> and it was apparent that their work environment was a more than pleasant and enjoyable.
>
> [D]uring the holidays, Masud's presents were always my favorite. Not because of the materialism…but the meaning behind them. When I was 8 years old, Masud came to the first night of Hanukkah with a tray of Quartz crystals. He had each of my cousins and I close our eyes and gravitate towards a crystal based on the energy that the crystal brought. As an eager child, I tried to open my eyes and pick the crystal I liked best, but Masud urged me to close my eyes and trust my intuition. Masud taught me a vital an impactful lesson that day – to trust my gut and not to take things at face value.
>
> He [Masud] is a big part of what makes my family so special, unique, and loving, and I know that his absence would cause immense heartache and sadness. Masud's son is seven years old, 11 years younger than I am, and it hurts me to think that his son could miss some of those same awe-inspiring lessons if Masud is separated from our family. A prolonged incarceration would be detrimental to the development of his son's childhood. …I ask you to please consider the effect that his absence would have on this young boy especially.

Nikki Rahimian is one of Masud's nieces. She is studying for a degree in Psychology. Ms. Rahimian writes to the Court:

> I can confidently say that my uncle Masud is one of the most loyal, generous, caring, kind, and hard-working individuals I know… I have watched my uncle's unrelenting support for so many of my loved ones including his daughter, 7-year-old-son, and my grandmother. I have also never met someone with such a generous heart who is always the first one so many people call in cases of hardship or crisis, because they know he is one to count on… I have never heard him place the blame of his actions on anyone but himself. He continues to provide strength for those around him .

Masud's sister Marjan Sarshar adds:

> Masud was the only boy in a family of 4 sisters. Years ago, my father passed away and Masud stepped up to be that fatherly, protecting, loving, responsible figure in our family. Masud is an intelligence, carrying, loyal, generous man. He is the loving father to two kids… His son is Mio… Masud often takes Mio on ski trips, surf lessons, and tries his best to help his son be active and happy. When Masud and his son come home from a ski trip, his son is always beaming with happiness…he depends on Masud for a strong companionship and looks at Masud as his role model.

Deborah Touffer Bergstein, a first cousin of Masud, observes:

> I know Masud my entire life… Masud is beyond generous, soft hearted, sensitive, kind, driven, and has helped an endless number of families and individuals over the decades. As immigrants to the United States and as a

> single mother, my mother worked several jobs to make ends meet and to raise me. Masud provided my mom with full time employment until she was able to find another job, and has employed many generations of our family over the years. …He is known for setting stepping stones and allowing individuals to expand their wings and fly independently as he has held many hands and helped pick up pieces. For Masud, there are ups and downs in his life over the decades, however, with each downward fall he has only been stronger…returning with growth and extreme success as he is known to learn from each experience… He has helped entire households after illness of a mother from cancer. He employed endless individuals to help jump start lives.

Keyvan Rahimian, Mr. Sarshar's brother-in-law, adds:

> Masud Sarshar is a doting uncle to my kids, Nikki and Pasha… …he would regularly visit and impart on the kids an unbiased insight on how people should fairly treat people, regardless of race, color, and gender. He has given us an appreciation of hard work and a responsibility to better our generation and ensure the next generation will do more… As a man, I can not help but admire him… I know that he eagerly awaits the opportunity to start over… He will not commit the same mistake again.

Rabbi Levi Cunin has served as director of the West Coast Chabad organization for over 50 years. Rabbi Cunin writes to the Court:

> Mr. Sarshar, with his extraordinary generosity has literally saved countless…lives. Over the years he has donated half

> a million dollars, covering the cost of thousands of scholarships, which has repaired the lives of thousands of families. The long term impact of Mr. Sarshar's generosity is everlasting and we will never be able to repay him for his kindness and compassion. Every child deserves to be raised in a loving and safe environment and thanks to the help of Mr. Sarshar, many children were able to witness the recovery and return of a sober Mum or Dad. Only G-d knows the exponential reach of Mr. Sarshar's benevolence.
>
> Your honor, I know firsthand the sincere regret that Masud feels for his unlawful actions. He has personally shared with me numerous times his feelings of intense shame and remorse. Masud is a unique human being with a kind and compassionate heart. I can honestly affirm that he genuinely cares about the welfare of others and tries his utmost to do whatever he can to help those less fortunate than himself.

Moshe Cohen adds in his letter:

> As a young student, studying in a Jewish institution, Mr. Sarshar made a tremendously positive impression on me. He is a unique and kind man who was a great source on inspiration to many of us, in fact, I remember thinking to myself "When I grow up, I want to be like Masud."
>
> Mr. Sarshar was truly a beacon of light and renowned for opening up his heart and home to the community. I will never forget how excited I was when he would invite our

> entire class to his home, to celebrate festivals and holidays. Mr. Sarshar would generously sponsor many events, from Chanukah parties to hosting BBQ's for the entire high school in celebration of the Jewish holidays. We were always made to feel welcome and comfortable in his home and he treated each student with the utmost respect and love. His genuine care and the individual attention he gave to us, inspires me to this day.
>
> High school can be a challenging time, many of the students in my class came from impoverished struggling families. Mr. Sarshar took a special interest in these kids and would make sure to give them extra attention and support, asking about their lives and worrying about their welfare.

Rabbi David Kesherim is on the Board of Directors of Chabad of California. Rabbi Kersherim describes in his letter:

> I have known Mr. Masud Sarshar for the last 30 years as honorable, helpful and caring person. He has been very helpful is supporting our homeless and children's program.
>
> I personally have approached him on many occasions to help the widows, the orphans and the needy families who would like to get married… Whenever we needed anybody to volunteer to help the children's school he has been accommodating as always… Whatever you do for Mr. Masud Sarshar will be greatly appreciated as he is loved and very much respected in our community.

## V.

## PERSONAL STRUGGLES WITH ALCOHOL

Masud first realized he had an alcohol problem in 2005. He describes it as "handling stress with alcohol" and recalls drinking about a bottle of hard liquor daily during the periods when he was drinking. In 2005, he entered Promises Malibu for a 30 day residential rehabilitation program, but dropped out after ten days and resumed drinking.

Three years later, Masud completed a 30 day residential alcohol rehabilitation program at Crossroads in Antigua, but again resumed drinking afterwards. Most recently, he completed the 30 day residential program at Seasons Malibu. Over the past three years, Masud estimates he spent about 15 months sober, and drank heavily the rest of the time.

Masud is fully aware that he needs to solve his drinking problem once and for all and would appear to be a good candidate for further alcohol rehabilitation.

## VI.

## BACKGROUND OF SECRET FOREIGN BANK ACCOUNT CASES

There exists a feature in these secret foreign bank account cases that is worth mentioning. This feature is significant enough to render our two year sentence reasonable, *even in the absence of any 5K1.1 departures.*

### A. <u>IRS Offshore Voluntary Disclosure Initiatives</u>

U.S. persons must report to the government foreign financial accounts over which they have signature authority or in which they hold a financial interest. Disclosures are required both on Schedule B to Form 1040, U.S. Individual Income Tax Return, and through FinCEN Form 114, Report of Foreign Bank and Financial

Accounts ("FBAR"). The FBAR is a form separate from a tax return that must be filed by June 30th of the year after the year being reported. Prior to 2009, compliance with the FBAR reporting requirements was very limited, according to government estimates.

Over the past 10 years, over 54,000 U.S. persons have disclosed their previously undisclosed foreign bank accounts to the U.S. government. The original impetus for most U.S. persons to disclose their accounts was the government's agreement with Swiss banking giant UBS, under which UBS would avoid indictment in the United States in exchange for paying fines, penalties and restitution totaling $780 million and disclosing to the U.S. government account information for certain accounts held by U.S. persons.

To manage the flood of individuals seeking to disclose their previously undisclosed foreign bank accounts, the Internal Revenue Service ("IRS") created a formal offshore voluntary disclosure program in 2009. The 2009 program was succeeded by a modified program in 2011 and an open-ended program that began in 2012. U.S. persons participating in the disclosure programs agreed to disclose information regarding their foreign bank accounts and to pay 20 to 27.5 percent of the highest aggregate balance of the disclosed accounts with all back taxes, tax penalties and interest. In exchange, the government agreed not to criminally prosecute these individuals or to impose penalties even greater than those applicable under the disclosure programs.

Not all U.S. persons with undisclosed accounts were eligible to make voluntary disclosures. For example, individuals for whom the source of funds was illegal were ineligible. Individuals under IRS audit or Department of Justice investigation were generally disqualified from making voluntary disclosures. Similarly, individuals, whose foreign account information the government already possessed, because of disclosures from foreign banks or from other sources, could not participate in the disclosure program.

Conversely, not all eligible individuals participated in the government's voluntary disclosure program. *See, e.g., Asher Rubinstein, Bringing A Foreign Bank Account Into Tax Compliance*, 64 Tax Notes Int'l 363, 364 (Oct. 31, 2011) (noting that the Department of Justice had investigated three Israeli banks that were "under particular scrutiny for offering bank services to American clients fleeing from UBS accounts and keeping one step ahead of American authorities as UBS prepared to reveal client identities and bank data"). Many are believed to have moved their funds out of Switzerland to banks in other foreign jurisdictions hoping to continue to evade U.S. tax and reporting obligations.

**B. <u>Offshore Criminal Tax Cases from 2008 to the Present</u>**

We are now nearly nine years into the government's push to target and prosecute U.S. persons who use secret foreign bank accounts to conceal foreign funds and, often, evade tax on any foreign income deposited in those accounts. By now the sentences imposed against those taxpayers who have pleaded guilty or even

gone to trial are significantly below the Guidelines. The Seventh Circuit put it this way when it upheld a two year probationary sentence for billionaire Ty Warner of Beanie Baby fame, even though his Guidelines range was 46-57 months in prison:

> Furthermore, probation is a common sentence in offshore tax evasion cases. The evidence introduced below shows that roughly half of the defendants convicted since 2008 have received terms of probation rather than imprisonment. And, of course, thousands more have avoided criminal prosecution altogether by entering the OVDP.

*United States v. Warner*, 792 F.3d 847, ____ (7th Cir. 2015).

We have prepared a spreadsheet, attached as Exhibit A, limited to cases primarily or exclusively involving offshore secret foreign bank account criminal tax charges from 2008 to the present on which we have obtained data. We eliminated facilitators and foreign banks and are left with individual taxpayers as defendants. The charges vary: 18 U.S.C. § 371 (*Klein* conspiracy); 26 U.S.C. § 7201 (evasion); 26 U.S.C. § 7206(1) (subscribing to a false return); and FBAR Violations under 31 U.S.C. §§ 5314 and 5322(a) (Willfully Violating Foreign Bank Account Reporting Requirements), but the Guideline calculations are identical, driven by tax loss no matter which statute is chosen. Some defendants had U.S.S.G. § 5K1.1 cooperation credit, some did not. Cooperation seems to have made little difference to the sentences imposed. The sentences are all low, even for those unlucky few who

received a custodial sentence. The three that went to trial and lost seem to have done as well as those who pleaded guilty.

Every case on Exhibit A was sentenced well below the Guidelines. By our count, in these 65 secret foreign bank account prosecutions, about 71% of taxpayers (46 of 65) sentenced have received probationary sentences, ten of which had short prison terms but most had either no incarceration or exclusively home detention. Of the remaining 19 cases, no defendant received more than 12 months and a day of incarceration, with seven defendants receiving a year and the remaining twelve defendants receiving between one day and ten months. Weighed against existing foreign bank cases, the two year stipulated sentence in this case is quite reasonable.

The most recent foreign bank case is illuminating. On February 10, 2017, the EDVA sentenced a noted business professor, Dan Horsky, who had hidden $200 million in foreign accounts and had a tax loss of $13 million, to seven months' incarceration. Professor Horsky's Guidelines range was 57-71 months. Even after accounting for his substantial assistance, the government was requesting 20 months and noted in its sentencing position that Horsky's conduct was perhaps the worst amongst all FBAR cases: "The size of the assets involved, the duration of the scheme, and intricacy of the conduct involved make it different and apart from any other prosecution to date involving undeclared foreign financial accounts." If the most-egregious case in FBAR history only merited a seven-month sentence, then the parties request for a two year sentence in this case is reasonable.

C. Reasons for the Light Sentences Imposed in Secret Foreign Bank Account Cases

This repeated, radical departure from the Guidelines recommended sentences is likely the result of factors, which are present in every case:

1. *The massive FBAR penalty insisted on by the government in its plea deals results in a counterbalancing reduction in jail time.*

Although courts have not found that a 50% FBAR penalty on the balance in an unreported foreign bank account—charged regardless whether the funds contain untaxable or taxable funds and whether they were earned legally or illegally—constitutes a punishment for double-jeopardy purposes, the discrepancy between the penalty and the harm caused weighs on courts when sentencing FBAR defendants.

Please look on Exhibit A at the FBAR penalty data. These civil FBAR penalties dwarf penalties imposed in other tax cases, and other fraud crimes. Nothing in the criminal law mandates imposing this civil penalty in a criminal case. Without the plea agreement, the prosecutors could not impose the FBAR penalty in this criminal case. Many courts apparently have the sentiment that the FBAR penalty alone is enough punishment for the non-disclosure, and have sentenced so.

2. *A Guidelines sentence would create disparity in the nationwide sentencing treatment of similar secret foreign bank account holders.*

We acknowledge this argument has a certain self-fulfilling prophesy to it. So what started this trend? We direct your attention to case number 40 on Exhibit A:

*United States v. Olenicoff*, 07-cr-227 (CDCAL 2008) which was a Central District of California case. The defendant in that criminal tax case paid $52 million in back taxes, penalties, and interest relating to undeclared foreign bank accounts aggregating $200 million. The defendant paid an FBAR penalty of zero. The defendant and the government stipulated to a no-tax-loss 7206(1) count based on defendant's failure to check the box on Schedule B of his Form 1040, which asks whether the taxpayer has any interest in or signatory authority over foreign accounts. At sentencing the government argued for three years' probation and the defendant argued for one year probation. The Court split the difference. Right after Olenicoff, we see the trend to low sentences in subsequent offshore criminal tax cases. The trend has held up through the present day.

3. *A Guidelines sentence would create disparity in the treatment of undisclosed foreign bank account holders processed under the OVDI and OVDP.*

Over 45,000 similarly situated taxpayers granted entry into "OVDI and OVDP" programs between 2009 and 2015, avoided prosecution altogether, and so avoided a felony criminal conviction, many for the same or far worse conduct. Logically, this pattern of non-custodial sentences results from the sentencing judges' recognition of the disparity of treatment by the government between taxpayers denied entry into "OVDI and OVDP" programs and who are prosecuted and similarly situated taxpayers who received amnesty for the same conduct when the government allowed them to participate in the OVDI and OVDP. The difference

between being prosecuted and allowed in to OVDI and OVDP was often a matter of luck. In one case in this office the distinction turned on whether the taxpayer applied to the government for the OVDP before going to lunch, when the IRS had not started his tax investigation, or after returning from lunch when, unknown to him, the investigation had officially begun. Absurdly, in the space of an hour, the taxpayer could go from solving his foreign bank problems with a civil case under the OVDP to having to accept a life-changing federal felony. Fortunately for the taxpayer, the request was made before lunch.

4. *A Guidelines sentence would create disparity in the local sentencing treatment of similar undisclosed foreign bank account holders.*

From what we can tell, this District has nine foreign-bank criminal cases sentenced. Details are at Exhibit A.

| **Name** | **Guidelines Range** | **Sentence** |
|---|---|---|
| Olenicoff, Igor | 0-6 months | 2 years probation |
| Sperling, Zvi | 12-18 months | 2 years probation |
| McCarthy, John | 24-30 months | 2 years probation |
| Kashfi, Guity | 12-18 months | 3 months incarceration |
| Iazlovsky, Alexei | 30-37 months | time-served (estimated one month) |
| Francis, Michael C. | 6-12 months | 3 years probation; 6 months home detention |

| | | |
|---|---|---|
| Cohen, Aaron | 12-18 months | 3 months incarceration |
| Ramifard, David | 18-24 months | 2 months incarceration |
| Hakimijoo, Monagem | 12-18 months | 6 months incarceration |

This Judicial District follows the national trend to sentence well below Guidelines sentences in foreign bank criminal tax cases. Sentences of incarceration in secret foreign bank cases are rare, based on the harsh FBAR penalty imposed and courts continuing the trend of non-custodial sentences imposed by their predecessor courts. This case should be treated the same as others in this district and throughout the United States. The below Guidelines Sentence in our case is appropriate, even without the 5K1.1 adjustments.

## VII.

## CONCLUSION

Masud Sarshar now faces sentencing in Federal Court for the improper manner in which he concealed a portion of his income offshore during his years in business. He acknowledges this fact and has expressed his contrition for having broken the laws of his adopted nation. Nonetheless, based on interviews with those that know him best as well as the 36 highly complementary character reference letters received on his behalf, it is clear that his chastened individual has done a tremendous amount of good in the community over the past three decades. As part of his long-term commitment to Chabad, he has sponsored many dozens of charitable events and has made hundreds of deserving high school students, many of

whom came from impoverished backgrounds, welcome in his home for holiday celebrations. Rabbi Boruch S. Cunin, the West Coast Director of Chabad, states with respect to Mr. Sarshar, "The long term impact of Mr. Sarshar's generosity is everlasting and we will never be able to repay him for his kindness and compassion."

Mr. Sarshar has lost his business. He has suffered personal and professional humiliation and is in the process of paying very substantial restitution. His remorseful is unquestioned. Furthermore, Mr. Sarshar has a young son who needs his father to be present in his life. Pursuant to the Rule 11(c)(1)(C) binding plea agreement, the parties have stipulated to 24 month term of imprisonment. Based on the totality of the factors present in this case, it is submitted that such a sentence would be "sufficient, but not greater than necessary" to effectuate justice in this matter and satisfy the factors enumerated at 18 U.S.C. §3553(a), and is respectfully requested.

Date: March 3, 2017

Respectfully submitted:

HOCHMAN, SALKIN, RETTIG,
TOSCHER & PEREZ, P.C.

By /s/Edward M. Robbins, Jr.
HOCHMAN, SALKIN, RETTIG,
TOSCHER & PEREZ, P.C.

Attorney for Defendant

6483618_1

# EXHIBIT
# A

| Defendant | Charges | Guidelines (months) | Prison Term (months) | Probation | Home Det | Fine |
|---|---|---|---|---|---|---|
| Abrahamsen, Harry | FBAR Violation | 21-27 mos | 0 | 3 years | 12 months | $15,000 |
| Ahuja, Arvind | FBAR Violation; 7206(1) | 41-51 mos | 0 | 3 years | | $350,000 |
| Barouh, Jack | 7206(1) | 30-36 mos | 10 | 1 year | | $5,000 |
| Berg, Christopher | FBAR Violation | 24-30 mos | 12 | | | |
| Bhasin, Josephine | 7206(1) | | 0 | 2 years | 3 months | $30,000 |
| Cambata, Albert | 7206(1) | 12-18 mos | 0 | 1 year | | $15,000 |
| Canale, Michael | FBAR Violation | 24-30 mos | 6 | 3 years | | $100,000 |
| Chatfield, Jeffrey | 7206(1) | 0-6 | 0 | 3 years | | |
| Chernick, Jeffrey | 7206(1) | 18-24 mos | 1 | 1 year | 6 months | |
| Chitkara, Rakesh | 7206(1) | 12-18 mos | 0 | 1 year | | $15,000 |
| Chon, Bae Soo "Chris" | 7201 | 24-30 mos | 12 | | | |
| Cittadini, Roberto | 7206(1) | 10-16 mos | time served | 1 year | 6 months | $10,000 |
| Cohen, Aaron | 371 | 12-18 mos | 3 | | | $30,000 |
| Curran, Mary Estelle | 7206(1) | | 0 | 5 seconds | | |
| Dahake, Vaibhov | 371 | 12-18 mos | 0 | 1 year | | $5,000 |
| Desai, Ashvin | 7206(1); 7206(2) | 78-97 mos | 6 | | 6 months | $7,500 |
| Eisenberg, Arthur | 7206(1) | 12-18 mos | 0 | 3 years | | $25,000 |
| Francis, Michael C. | FBAR Violation; 7206(1) | | 0 | 3 years | 6 months | $4,000 |
| Ginzburg, Anton | FBAR Violation | | 0 | 5 years | | $25,000 |
| Gomez, Humberto | 7206(1) | | 0 | 3 years | | |
| Greeley, Robert | 7206(1) | | 0 | 3 years | 6 months | $3,000 |
| Gurary, Edward | 7206(1) | 10-16 mos | 0 | 3 years | | |
| Hakimijoo, Monagem | 7206(1) | 12-18 mos | 6 | 2 years | 1 year | $30,000 |
| Handelsman, Moshe | 7206(1) | 30-37 | 0 | 2 years | | $6,000 |
| Heller, Kenneth | 7201 | 30-37 mos | 45 days | 2 years | | $180,000 |
| Hernandez, Federico | 7206(1) | | 12 | | 6 months | $4,000 |
| Hoess, Lothar | FBAR Violation | | 0 | 3 years | 8 months | $10,000 |
| Homann, Juergen | FBAR Violation | 30-37 mos | 0 | 5 years | | $60,000 |
| Horsky, Dan | 371 | 57-71 mos | 7 | | | $250,000 |
| Iazlovsky, Alexei | 7206(1) | 30-37 | time served | | | $60,000 |
| Jackson, Lucille Abrahamsen | 7206(1) | | 0 | 1 year | | |

| | | | | | | |
|---|---|---|---|---|---|---|
| Kampfen, Pius | FBAR Violation | 6-12 months | 0 | 2 years | 6 months | $20,000 |
| Kashfi, Guity | 371 | 12-18 mos | 3 | | | $20,000 |
| Kerr, Stephen | FBAR Violation; 7206(1); 371 | 41-51 mos | 10 | | | $10,000 |
| McCarthy, John | FBAR Violation | 24-30 mos | 0 | 3 years | 6 months | $25,000 |
| Moran, Robert | 7206(1) | 10-16 mos | 2 | 1 years | 5 months | |
| Mukhi, Raju | FBAR Violation; 7206(1) | | 0 | 3 years | 0 | |
| Olenicoff, Igor | 7206(1) | 0-6 mos | 0 | 2 years | | |
| Quiel, Michael | FBAR Violation; 7206(1); 371 | 41-51 mos | 10 | | | |
| Quintero, Luis | FBAR Violation | | 4 | 3 years | | $10,000 |
| Ramifard, David | 371 | 18-24 | 2 | | | $40,000 |
| Reiss, Michael | FBAR Violation | | 1 day | 3 years | 8m (half house) | |
| Robbins, Jules | 7206(1) | | 0 | 1 year | | $2,000 |
| Roberts, Nadia | 7206(1) | 30-36 mos | 12 | | | |
| Roberts, Sean | 7206(1) | 30-37 mos | 12 | | | |
| Roessel, Wolfgang | 7206(1) | | 0 | 3 years | 8 months | $10,000 |
| Rubinstein, Steven Michael | 7206(1) | | 0 | 3 years | 12 months | $40,000 |
| Rudolph, Gregory | FBAR Violation | 10-16 mos | 0 | 1 year | 1 month | $3,000 |
| Rusch, Christopher Martin | FBAR Violation; 371 | 30-37 mos | 10 | | | $10,000 |
| Schiavo, Michael | FBAR Violation | | 0 | 1 year | 1 month | |
| Schober, Peter | FBAR Violation | | 1 | 6 months | 2 months | $3,000 |
| Sethi, Sanjay | 371 | 24-30 | 0 | 1 year | | |
| Shoham, Meancham | 371 | | 3 | | | $30,000 |
| Silva, Andrew | 371; 1001 | | 0 | 2 years | 4 months | $20,000 |
| Sperling, Zvi | 371 | 12-18 mos | 0 | 2 years | | $30,000 |
| Troost, Peter | 7201 | 37-46 mos | 12 | | | $32,500 |
| Upham, Sybil Nancy | 371; 7206(1) | 30-37 mos | 0 | 3 years | | $30,000 |
| Vogliano, Ernest | 371; 7206(1) | | 0 | 2 years | | $10,000 |
| Wajsfelner, Jacques | FBAR Violation | | 0 | 6 months | 3 months | $20,000 |
| Warner, Ty | 7201 | 46-57 mos | 0 | 2 years | | |
| Werdiger, Richard | FBAR Violation; 7206(1); 371 | 24-30 mos | 12 | | | $50,000 |
| Zabczuk, Paul | 7206(1) | 8-14 mos | 0 | 3 years | 12 months | $2,000 |
| Zaltsberg, Leonid | 7206(1) | 12-18 mos | 0 | 4 years | 12 months | $3,000 |

| Commun Ser | Restitution (Tax Loss) | FBAR Penalty | Court | Docket | Plea ? | Sent date | 5K? | Skim? | Judge |
|---|---|---|---|---|---|---|---|---|---|
| | | | NJ | 10-cr-254 | yes | 5/24/2011 | yes | | Dennis Cavanaugh |
| 450 hours | | | WI, ED | 11-cr-135 | trial | 2/1/2013 | | | Charles Clevert, Jr. |
| | | | FL, SD | 10-cr-20034 | yes | 4/23/2010 | yes | | Adalberto Jordan |
| | $270,757 | $287,896 | CA, ND | 12-cr-877 | yes | 2/26/2014 | | | Lucy Koh |
| 150 hours | | | NY, ED | 11-cr-268 | yes | 3/8/2013 | | | Arthur Spatt |
| | $84,849 | | VA, ED | 15-cr-362 | yes | | | | Claude M. Hilton |
| 400 hours | $216,407 | | NY, SD | 12-cr-975 | yes | 4/25/2013 | | | Denise Cote |
| | $2,000 | $96,269 | CA, SD | 10-cr-4546 | yes | 3/14/2011 | | | Michael Anello |
| | | $4,000,000 | FL, SD | 09-cr-60182 | yes | 10/30/2009 | yes | | James Cohn |
| | $27,000 | $839,885 | NJ | 13-cr-202 | yes | 10/10/2013 | | | Mary L Cooper |
| | $522,649 | $441,482 | MD | 12-cr-506 | yes | 2/15/2013 | | | William D Quarles, Jr |
| 200 hrs | $17,985 | | WA, WD | 09-cr-344 | yes | 1/8/2010 | yes | | Ricardo Martinez |
| | $66,660 | $1,725,000 | CA, CD | 13-cr-498 | yes | 3/10/2014 | yes | | John Walter |
| | | $21,600,000 | FL, SD | 12-cr-80206 | yes | 4/26/2013 | | | Kenneth Ryskamp |
| | | | NJ | 11-cr-42 | yes | 5/22/2013 | yes | | Freda Wolfson |
| | $0 | $0 | CA, ND | 11-cr-846 | trial | 7/7/2014 | | | Edward J Davila |
| | | | WA, WD | 10-cr-369 | yes | 3/4/2011 | | | John Coughenour |
| | | | CA, CD | 12-cr-805 | yes | 6/17/2013 | | | George King |
| | | | NY, ED | 11-cr-432 | yes | 4/9/2013 | | | Sterling Johnson Jr. |
| | $10,748 | | FL, SD | 12-cr-20198 | yes | 7/23/2013 | | | Jose Martinez |
| | $16,869 | $6,851,930 | CA, ND | 11-cr-374 | yes | 11/9/2011 | | | Charles Breyer |
| | $16,182 | $664,566 | OH, ND | 11-cr-72 | yes | 4/9/2014 | | | Dan Polster |
| | $59,528 | $1,007,811 | CD CA | 13-cr-00075 | yes | 8/4/2014 | | | John Walter |
| | $720,608 | $1,520,958 | CA, ND | 13-cr-384 | yes | 2/12/2014 | yes | | Lucy Koh |
| | | $9,816,000 | NY, SD | 10-cr-388 | yes | 1/20/2012 | | | Kevin Castel |
| 200 hours | $84,423 | | NY, SD | 10-cr-334 | yes | 9/17/2010 | | | Denny Chin |
| | $2,033,209 | $1,372,774 | NH | 11-cr-154 | yes | 3/29/2012 | | | Steven McAuliffe |
| 300 hours | | $2,500,000 | NJ | 09-cr-724 | yes | 1/6/2010 | yes | | Stanley Chesler |
| | $13,000,000 | $100,000,000 | VA, ED | 16-cr-224 | yes | 2/10/2017 | yes | | T. S. Ellis III |
| | < $1,000,000 | $1,115,030 | CA, CD | 13-cr-344 | yes | 3/17/2015 | yes | | Terry J Hatter Jr |
| | | $379,688 | NJ | 10-cr-797 | yes | 5/23/2011 | | | Dennis Cavanaugh |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | $6,420 | $1,465,393 | CA, ND | 13-cr-369 | yes | 10/4/2013 | | | Thomas Moore |
| | | $61,965 | $1,750,000 | CA, CD | 13-cr-241 | yes | 3/14/2014 | yes | | John Walter |
| | | | | | | trial | | | | James A Teilborg |
| 300 hours | | $485,000 | $486,736 | CA, CD | 09-cr-784 | yes | 3/22/2010 | yes | | Valerie Fairbank |
| | | | | FL, SD | 09-cr-60089 | yes | 11/6/2009 | yes | | James Cohn |
| | | $838,439 | $6,000,000 | MO, ED | | | | | | |
| 120 hours | | $52,000,000 | $0 | CA, CD | 07-cr-227 | yes | 4/14/2008 | | ? | Cormac Carney |
| | | | | | | trial | | | | James A Teilborg |
| 250 hours | | | $2,000,000 | FL, SD | 12-cr-20192 | yes | 7/24/2012 | | | Federico Moreno |
| | | | | CA, CD | 13-cr-725 | yes | 12/15/2014 | yes | | John Walter |
| 30 hrs/wk | | $458,550 | | NY, SD | 11-cr-668 | yes | 1/11/2012 | | | Richard Berman |
| | | | $20,830,000 | NY, SD | 10-cr-333 | yes | 9/21/2010 | | | Richard Holwell |
| | | $709,675 | $2,509,521 | CA, ED | 11-cr-99 | yes | 7/30/2012 | yes | | Anthony Ishii |
| | | $709,675 | $2,509,521 | CA, ED | 11-cr-99 | yes | 7/30/2012 | yes | | Anthony Ishii |
| 200 hours | | $312,803 | $5,750,934 | FL, SD | 12-cr-60074 | yes | 10/11/2012 | | | Kathleen Williams |
| | | | $3,500,000 | FL, SD | 09-cr-60166 | yes | 10/28/2009 | yes | | Marcia G Cooke |
| | | | $980,065 | MA | 10-cr-10360 | yes | 11/17/2011 | yes | | Nathaniel Gorton |
| | | | 50% | | | yes | | yes | | James A Teilborg |
| | | | $76,283 | MA | 11-cr-10192 | yes | 5/1/2012 | | | Richard Stearns |
| | | | $777,986 | MA | 10-cr-10359 | yes | 10/6/2011 | | | Nathaniel Gorton |
| | | $102,167 | $2,373,575 | NJ | 13-cr-10 | yes | 11/20/2013 | | | Jose Linares |
| | | $36,287 | | | | | | | | |
| 100 hrs | | | | VA, ED | 10-cr-44 | yes | 6/15/2010 | | | Liam O'Grady |
| | 1200 | $70,918 | $1,040,506 | CA, CD | 13-cr-108 | yes | 8/26/2013 | yes | | John Walter |
| 200 hours | | $1,039,343 | | IL, ND | 13-cr-185 | yes | 7/17/2013 | | | John J. Tharp Jr. |
| 300 hours | | | $5,500,000 | NY, SD | 10-cr-326 | yes | 4/25/2013 | | | Alvin Hellerstein |
| | | | $940,381 | NY, SD | 10-cr-327 | yes | 4/21/2011 | | | Thomas Griesa |
| | | $419,940 | $2,844,433 | NY, SD | 12-cr-641 | yes | 3/5/2013 | | | Naomi Buchwald |
| 500 hours | | $5,594,877 | $53,553,248 | IL, ND | 13-cr-731 | yes | 1/14/2014 | | | Charles Kocoras |
| | | $397,404 | | NY, SD | 10-cr-325 | yes | 12/16/2011 | | | Paul Gardephe |
| 150 hours | | $267,597 | $264,597 | FL, SD | 10-cr-60112 | yes | 7/27/2010 | yes | | William Dimitrouleas |
| | | | | NJ | 10-cr-437 | yes | 12/20/2010 | | | Stanley Chesler |

| Def Atty | Bank | Notes |
|---|---|---|
| Michael Sarder/Caroline Rule | UBS | |
| Dan Webb | HSBC | |
| Robert Panoff | UBS | |
| Edward Robbins | UBS | |
| Bernard Mark | HSBC | |
| Joseph J. Aronica | UBS | |
| Bob Fink | UBS, Wegelin | |
| Richard Carpenter | UBS | |
| Douglas Tween | UBS | |
| Ian Comisky | UBS | |
| Caroline Delisle Ciraolo | HSBC, Bank Woori | |
| John Colvin | UBS | |
| James Spertus | Israeli banks | |
| Roy Black | UBS | 43 million in accounts; inherited from husband |
| Lawrence Horn | HSBC | |
| Martin A. Schainbaum | HSBC | |
| Darrell Hallett/John Colvin | UBS | |
| Victor Sherman | UBS | |
| Jeffrey Harris | UBS | |
| Fred Haddad | UBS | |
| Jay Weill | UBS | |
| Frederick Widen | Credit Suisse | |
| Robert Horwitz | Bank A | Account was joint with his brother, who paid 50% of his half |
| Scott Frewing | Bank A | |
| Robert Fink | UBS, Wegelin | |
| Nancy Kestenbaum/Barbara Hoffm | UBS | |
| Peter Anderson | UBS | |
| Cynthia Reed Eddy | UBS | |
| Mark Matthews | Swiss Bank | |
| Marc S. Harris | Bank A in Luxembourg | |
| Robert Mintz | UBS | |

| | | |
|---|---|---|
| Jay Weill | UBS, Pictet, ABN-Amro | |
| Edward Robbins | Bank Leumi | |
| Michael D Kimerer | UBS, Pictet | Kerr, Rusch and Quiel are related |
| Steven Toscher | UBS | |
| Gary Bagliebter | UBS | |
| | | Total accounts approx $14 million |
| Edward Robbins | UBS | $200,000,000 in the foreign bank accounts |
| Joy Malby Bertrand | UBS, Pictet | Kerr, Rusch and Quiel are related |
| Ian Comisky | UBS | |
| Dennis Perez | | |
| Paula Junghans | UBS, Swiss Bank 1 | |
| Martin Perschetz | UBS | |
| Edward Robbins | UBS, Liecht bank | |
| Edward Robbins | UBS, Liecht bank | |
| Lee Stapleton | UBS | 11 million in accounts; had variety of accounts; disclosed only UBS accounts when UBS se |
| Robert Panoff | UBS | |
| Joseph Aronica | UBS | |
| Baltazar Iniguez | UBS, Pictet | Kerr, Rusch and Quiel are related |
| James Lawson | HSBC | |
| Terry Segal | UBS | |
| Amy Walsh | HSBC | |
| | | $588k in account; was repeatedly warned to participate in OVDP, chose not to. |
| Matthew Conner Hicks | Credit Suisse | |
| Steven Toscher | Leumi, Mizrahi | |
| Theodore Sinars | UBS | |
| Elkan Abramowitz/Rachel Hemani | UBS | |
| Richard Alpert | UBS | |
| Jeffrey Denner | Credit Suisse, Wegelin | |
| Mark Matthews/Greg Scandaglia | UBS, ZKB | Accounts in excess of $100 million |
| Ian Comisky | | |
| Scott Frewing | UBS, Banque Cantonale Vaudois | |
| James DiPietro | UBS | |

# LETTERS OF SUPPORT

February 20, 2017

Honorable Philip S. Gutierrez
350 West 1st Street
Los Angeles, CA 90012

Dear Judge Gutierrez,

Your Honor, I would like to thank you for the opportunity to write to you and address the court about what I have done.

I realize that it is customary for defendants to formally accept responsibility for their actions, but I want to convey to you that for me this is far more than a formality. Your Honor, I am deeply sorry for my actions which were selfish and unlawful. I know what I did was wrong. I look back on the decisions I made, and I know that what I did was serious, it was very wrong, and it cannot be allowed to pass without serious consequences.

I respect the judiciary process and understand its purpose. I realize that actions have consequences and am prepared to face the consequences imposed by the Court. I have learned from this mistake, and I wish only to make amends to the government and society as best I can through restitution and time spent in custody, then put this behind me and get back to work to contribute to my family and my community.

Your Honor, please accept my most heartfelt and sincere apologies to you, the Court, to the United States government, to my family, and to all those who have been negatively impacted by my unlawful behavior. I commit to you with absolute conviction that I will never under any circumstances disobey the laws of this country, which has given me such opportunity and treated me with fairness throughout my life.

Respectfully submitted,

Masud Sarshar

February 5, 2017

Honorable Philip S. Guitierrez
United States District Judge
350 West 1st Street
Los Angeles, California 90012

Honorable Philip S. Guitierrez,

I deeply appreciate the opportunity to provide a character reference for my cousin, Masud Sarshar.

My name is Sep Sarshar, I'm 50 years old and I've resided in the United States since I was eleven years old. I'm a graduate of UCLA and Harvard, with a PhD in organic chemistry. My professional carrier started in 1994 as a research scientist in a San Diego start up biotech company where I worked on new cures for cancer and diabetes. I went on to start Auspex Pharmaceuticals in 2001 where our team developed a number of new medications for a variety of diseases. The company went public in 2014 and was acquired by Teva Pharmaceuticals in 2015. After a short tenure at Teva as a consultant, my father announced his retirement, and my brother and I took over the family real estate development business.

My immediate and extended family moved to Los Angeles from Tehran following the Islamic Revolution in order to flee religious and political persecution. We were all fortunate to receive citizenship in this country, and as a general rule, we have worked hard to assimilate into the culture and play by the rules. As a result, the members of the Sarshar family have been productive members of the community and have created many jobs that have helped hundreds of individuals in their pursuit of the American dream. We owe all of this to the safe environment provided by the laws and protections of the United States of America. Our family members understand that no one is above the law and we strive to live up to that standard each and everyday.

I deeply love and respect Masud. He has had many ups and downs in his life, made a lot of money and lost it all, but he has always managed to come up for air. I believe that his resilience is not a random occurrence, as the majority of our family members have followed a similar path. I'm not going to sugarcoat it. Masud made a big mistake and is now paying for it, but I believe that when taken in context, one can understand why he went down this road in the first place. I'm not trying to justify his behavior; but would like to shed some light on the state of his psyche when he made those flawed decisions.

Masud's father, Mansur, was one of eight children born to Josef and Tooba Sarshar. The family had resided for many generations in the Jewish ghetto of Isfahan. Josef Sarshar was a bus driver, and as it was customary in those days, Tooba was a homemaker. Jews had resided in the Persian Empire going back 3,000 years and had seen their social status ebb and flow under various rulers. Following the Arab invasion and institution of Islam as the official state religion, Persian Jews became second-class citizens and many of their rights were taken away. Isfahan had been the political and religious capital of the Persian Empire for centuries, and as such, it had always been veiled in a deeply rooted anti-Semitic atmosphere. Stories of religious persecution and discrimination were commonplace at our family gatherings, and as children, we were always reminded that we were never safe and had to study and work hard to make sure we had a "way out" in case things got out of control.

In the 1960's and 1970's, driven by increasing oil revenues, Iran was undergoing a major economic revival. The Shah of Iran had unveiled a national development program that included an overhaul of the infrastructure, manufacturing and agricultural sectors, education and banking. Foreign investments in Iran were skyrocketing, real estate was booming, and with it, a new upper middle class came into existence. By this time, the Sarshar family had made the move from Isfahan to Tehran and all family members had become successful businessmen with import/export businesses and a sizeable real estate portfolio. That said, none of them ever forgot their humble and traumatic beginnings. Although times were good, most Jewish Iranians still distrusted their government and it was common practice to secretly transfer money out of the country in order to have a safety net in case political winds changed direction.

One can argue that the United States is not Iran, that we live in country of laws and religious freedoms, and as such there should be nothing to fear. As I mentioned above, I'm not trying to justify Masud's actions. I'm simply providing some insight as to why he would make certain decisions. The deteriorating effect of this train of thought was compounded with much bad advice. I also know that he was under a lot of stress during the time when he made these decisions. He was abusing alcohol and pain medications that undoubtedly further clouded his judgment.

Masud has undergone drug and alcohol rehabilitation. He's a dedicated father and a generous human being who's loved by every person who knows him. He presents no danger to society. He made a mistake and should pay a fine in order to clear his debt to society. I plead with your Honor to take the above into consideration and perhaps mandate him to provide community service that is in line with the gravity of his mistake.

Respectfully,

Sep Sarshar

To: Honorable Philip S. Gutierrez
United States District Court Judge
350 West 1st St.
Los Angeles, CA. 90012

January 27, 2017

Re: Masud Sarshar

Dear Honorable Gutierrez,

My name is Carol Wehling and I am writing to you about my personal experiences and the man I have come to know over the past 20 plus years. I want to start with thanking you in advance for taking the time to read this.

I have worked in the Apparel Industry like Masud for most of my adult life. I began in the industry when I was 19 years old. I first hand know it is a dynamic industry to be a part of and one too, which can be the most unglamorous and cutthroat of all.

I have worked hard through out my career and like many others have experienced great ups and downs, wonderful achievements, and at times unbearable challenges.

I am aware of the charges facing Masud and I understand the serious nature of them. I personally believe in the rule of law as an American citizen and believe in the justice system.

I also believe in second chances and those who make mistakes some huge as in this case and some small but have the heart and consciousness like he has to realize their mistakes and choose to turn over a new leaf and pursue life which we only get one time on this earth to have.

Over this last Christmas Holiday I recently was able to buy out my former partner's shares of equity in a home we owned together and it was a big moment for me. A very prideful moment of finally being a sole homeowner in a city I adore and worked very hard to achieve. I was sitting on my couch and thought of people who have journeyed into my life and the impact they made on me and like every Christmas I think of those people and things I am thankful for.

I thought of Masud strongly during my Christmas break after just moving into my home because I feel so often if it weren't for him and the career opportunities he gave me I am honestly not sure I would be in the position I was to purchase this house. I know I worked my butt off, I am aware of my work success and success Masud and I both shared. He was my employer I was fortunate to be his Sales Manager then later he personally promoted me for my hard work to VP. He is the guy who gave me my shot the chance to be the best I can be and taught me so much of which I know today.

I have experienced many employers and owners of companies before I can honestly say Masud was one of a small few who always consistently treated me with respect, dignity and most of all one of the most loyal men I have ever known.

It wasn't just me it was numerous coworkers too who were given opportunity after opportunity to work in his successful company. He never treated me poorly his heart is huge and giving and I could always count on him. Not often in our business we can say we can count on someone but Masud was one I counted on. I believe our relationship was the same and I would guess he felt the same way that he could count on me too. Even before I worked for him full time he gave me chances to sell his products and he always honored every commitment to me. The man I have known for so long I can confidentially say has always been a man of his word.

In my long tenure working relationship with him I honestly can say he was upset me that I am aware of one time. He sure raised his voice with me in the conference room over a misunderstanding. I am the one who was wrong I made a pretty big mistake. Masud comes to my desk an hour later puts his arm around me and apologized for getting upset with me. That's the guy I love and know he turned it around and made me feel better when most others would never do that.

Masud is one of the most visionary brains in the business. He was the first to fight for and pioneer a license with a massive and difficult to work with brand of work wear. He not only employed hundreds of people but the way he cared is something Ill never forget. I will never ever forget him telling me one day in the conference room " I am responsible for every employee I have here". I will never ever forget his torment and struggle over the increase in Health Care premiums for his employees and how much that was costing the Company but he kept it going anyway for us. He didn't have to but he cared and he did. He rewarded us handsomely if we excelled with year-end bonuses, he didn't have to but he did.

I remember one meeting we had where corporate wanted him to distribute goods to Walmart. He fought this he knew the moment he had to do that it would be our smaller retailers to pay the price and not be able to compete. Where others would take just the big Walmart business and run... Masud lowered his prices took a massive margin loss in his company and matched prices for the small retailer. That is the kind of owner he was and is. He took care of his employees even some who weren't so kind to him but he felt this deep obligation and gratitude to his staff. In fact he couldn't even fire a bad employee his heart is golden. He may not know I know this, But I also know he took care of some employees family problems personally financially and behind the scenes, I know he paid for one families funeral and helped employees out when they got into a bind.

I could go on, as there are too many amazing stories like this but for me personally, I am grateful for him. He afforded me the break, the shot, the job, the opportunity and most of all a great long standing trusting friendship. We can go months without connecting but when we do its like it always was. Loving, caring, and always with

brainstorming ideas. He ALWAYS had my back when at times some others in the job didn't. He is ahead of his time he loves all people and I can say that because he never ever once questioned or cared about my sexuality he doesn't care about peoples skin color or where they come from. He believes in good workers and rewarding them for their achievements. I honestly wouldn't be where I am today without him having a part in my journey in life.

Your Honor, I know Masud I know how this has impacted him. I know how regretful he feels and wants nothing more than a "do over in life". I also know he feels worse for his family who he has always taken care of. I know his family is victim too in his mess and his family needs him out with them not locked in. He helps is family, he always supported his family and I strongly believe his young son needs his Dad around. Masud is too special and too brilliant of a man to be put away. He has too many big business ideas and so many things to still accomplish and so many people potentially to be employed by him and work for him. We all need him. He will continue to do right, he will certainly not screw up a second chance if he was to be given one and he will open his next business and continue to give more people like me that chance in life, that break in the workplace, that giving education and extreme knowledge to share for many others out there and that paycheck to live on.

I can promise you. That is the man I know and am personally grateful for. He will do you proud and continue to do such good for all others out there seeking honest work and help so many more fulfill their life dreams.

Sincerely,

Carol Wehling
984 S Calle Santa Cruz
Palm Springs, CA. 92264
626-298-0607
cwehling@outlook.com

January 23, 2017

Dear Madam or Sir:

I have known Masud Sarshar for more than 20 years through my employment with his company, Apparel Limited, Inc. During my employment through July 2015, the company faced many ups and downs, but Masud was always a very compassionate and fair employer to me.

I'm very appreciative to Masud for giving me confidence in my abilities by allowing me to learn many facets of the apparel industry. This opportunity to grow within his company eventually led to me running the warehouse operations.

With a warehouse staff of over 30 employees, we were successful because we were able to retain good employees. I believe a main factor in this ability to retain good employees was Masud's show of appreciation towards his employees. This included health insurance benefits to all full time employees, employee discounts on merchandise, lunches on special occasions, as well as office holiday parties. The low turnover rate of employees leads me to believe they felt similarly towards Masud as I did.

I believe Masud is a good person that is valuable to society by being a good employer and providing good jobs.

Sincerely,

Tim Radecki

Tim Radecki

Hubert Guez
20752 Pacific Coast Highway
Malibu, CA 90265

Honorable Philip S. Gutierrez
United States District Judge
350 West 1st Street
Los Angeles, California 90012

Your Honor,

My name is Hubert Guez, I am sixty-four years old and have been married to my first and only wife Roxanne for over 35 years and we have two grown children, Stephan and Griffin. I have been in the apparel industry for over forty years. Recently I acquired an apparel brand and opened a sewing factory in Vernon California, I am also finalizing the acquisition of an apparel industrial garment laundry in Long Beach California. My current efforts are towards the creation of a branded sportswear line made in the USA and yet affordable to the public through mass merchants distribution. The launch of this line is scheduled for May of this year.

I have known Masud Sarshar for over fifteen years and I am familiar with his career in the apparel industry, I came to understand the uniqueness of his contribution in the industry. I met Mr. Sarshar through my nephew Danny Guez and my brother Gerard Guez with whom he has been close in many years. I know for a fact that he was considered a straight shooter and a good guy and that he had helped them in many occasions, When my older brother, Paul Guez needed help, Mr. Sarshar gave a position to my brother in his organization and always treated him with respect and kindness. I have had many personal interactions with Mr. Sarshar and I came to realize that his thinking was not selfish and he was always thinking in terms of teamwork and team building, he insisted his colleagues be partners in the projects we were discussing at the time. While we did not undertake a business venture at the time, I stayed certain that we might because I appreciated greatly his view on how to build a business to last.

I am aware that Mr. Sarshar pleaded guilty to tax evasion. I live very close to Mr. Sarshar and had many occasions to sit with him before and after his guilty plea. I know that he is devastated by this situation and has accepted personal responsibility in the matter. He is ready to assume the consequences of his action and is thinking of ways to put his life back together and have a new start. I believe him to be sincere.

I have extremely high regard for Mr. Sarshar's expertise and impact on our industry, He took a basic work wear brand and offered the consumer a more fashion oriented

product in colors and silhouette at affordable consumer prices. I believe that Mr. Sarshar in fact opened the door to what is known as the "fast fashion" trend, represented by Forever 21, Zara or H&M.

I consider that Mr. Sarshar has great flair for the right design and a great deal of experience with mass-market distribution. As evidence of my respect and trust for Mr. Sarshar, I can offer no higher expression of confidence that the fact that I would offer immediately to Mr. Sarshar a position in our company to help us with the launch and management of our project. I would even consider building a separate division for and around Mr. Sarshar to leverage his immense knowledge and connections in the area of fashion product designed for mass merchant. I would do this because of his tremendous experience but also because I absolutely trust him as an honorable and reliable business partner.

Thank you, Your Honor, for reading this letter and considering what I have to say about Mr. Sarshar.

Respectfully,

Hubert Guez

February 8, 2017

Honorable Philip S. Guitierrez
United States District Judge
350 West 1st Street
Los Angeles, California 90012

RE: Character Reference for Masud Sarshar

Dear Honorable Guitierrez,

I am humbled by the fact that my dear friend Masud has asked that I write a letter of reference on his behalf. My name is Iqbal Hassan and I am the owner/broker of The Quantum Associates, a boutique real estate firm specializing in the sales, leasing, and management of properties in the greater Fashion District of Los Angeles. I met Masud in 1988 when I started my career in real estate in downtown Los Angeles. At the time, Masud had a small table at the end of the Santee Alley from which he would sell garments. We met through a mutual client and one day Masud called me, immediately gave me his space requirements, and my search began. Little did I know that nearly twenty five years later, a man who was selling garments from a 3'x6' picnic size table would have created a business that employed hundreds of people and occupied over 100,000 square feet of space by taking tremendous risks in creating a women's fashion line that has become and still remains the iconic Americana women's work wear fashion line known as Dickie's Girl.

In those twenty five years, Masud had many financial ups and downs but no matter what his financial status, he paid all his obligations and made sure that his employees were taken care of, often at his own expense. He remained loyal to his friends, family, customers, vendors, and employees. Through his loyalty to those around him, he helped others establish businesses, careers, families and households by offering not only financial assistance but positive encouragement and support. He has enriched the lives of countless individuals from all walks of life. I am reminded of a homeless man that lived out of a trailer near Masud's warehouse in Boyle Heights who, upon hearing of Masud's incarceration, had tears in his eyes because he recalled that the first time Masud met him, Masud not only gave him work, but also gave him a hug when most people wouldn't even shake the homeless man's hand. Masud was and always will be a visionary that thinks "outside the box". More than fifteen years ago, he hired and paid graffiti taggers to paint murals on his buildings so that they could express their artistic talents rather than create neighborhood blight. These are small examples of the types of actions that

Masud would undertake to help the needy and troubled. If ever anyone was willing to lend a helping hand, that would be Masud.

Masud was always known to be a risk taker, highly intuitive, and a very trusting individual. I firmly believe that it was these characteristics that helped him achieve his aspirations and brought him great success. But I'm disheartened that these are the same characteristics that probably led him to make the mistakes that put him into trouble.

Your honor, I ask that you grant Masud the utmost consideration and leniency. Masud's incarceration will help no one. In fact, it will negatively impact the lives of many innocent people around him including immediate and distant friends and family. Throughout his life, Masud has repeatedly demonstrated that he is capable of great things and he is the type of person that shares his success with others which enrich their lives as well. He is a warm compassionate man that would do no harm to anyone or anything.

Your honor, thank you again for your time and consideration.

Sincerely,

Iqbal Hassan

Honorable Philip S. Guitierrez

United States District Judge

350 West 1st Street

Los Angeles, California 90012

Dear Honorable Philip Guitierrez,

My name is Bebegol Lari, a proud niece of Masud Sarshar. I'm 18 years old currently living and studying in Los Angeles at the University of Southern California earning my degree in Business Administration.

Since the day I was born, Masud has been one of the most prominent people in helping develop my character and shaping me into the person I am today. Beyond being a successful businessman, father to two incredible children, loving son to his mother, and trustworthy brother to his four sisters, Masud was a role model for me growing up. He taught me to be headstrong, determined, brave, and to never give up. His lust for life, travel, art, music, and food, spawned my passions and inspired me to do many of the things I've accomplished to this day.

In school, I study business in hopes of being half the successful businesswoman as Masud was a businessman. His success in building the empire of Apparel Limited set the stage for what I want to pursue as a career- an entrepreneur. I often visited Masud at work when I was a child and my memories at his office were some of the fondest of my childhood. His employees were always cheerful and happy and it was apparent that their work environment was more than pleasant and enjoyable.

During the holidays, Masud's presents were always my favorite. Not because of the materialism of the present, but the meaning behind them. When I was 8 years old, Masud came to the first night of Hanukkah with a tray of Quartz crystals. He had each of my cousins and I close our eyes and gravitate towards a crystal based on the energy that the crystal brought. As an eager child, I tried to open my eyes and pick the crystal I liked the best, but Masud urged me to close my eyes and trust my intuition. Masud taught me a vital and impactful lesson that day- to trust my gut and not to take things at face-value.

I am grateful for Masud and the lessons he taught me today and everyday, for without him I don't know where I'd be. Having Masud a part of my family has been one of the greatest pleasures of my life.

I know that since the days of my childhood, Masud has gone through deep struggles, but he has faced those struggles with poise and strength. I believe that Masud has since learned from his mistakes and understands the magnitude of his actions. He is a big part of what makes my family so special, unique, and loving, and I know that his absence would cause immense heartache and sadness. Masud's son is seven years old, 11 years younger than I am, and it hurts me to think that his son could miss some of those same awe-inspiring lessons if Masud is separated from our family. A prolonged incarceration would be detrimental to the development of

his son's childhood. His son deserves to learn from his amazing father and I ask you to please consider the effect that his absence would have on this young boy especially.

With my sincerest regards,
Bebegol Lari

Honorable Philip S. Guitierrez
United States District Judge
350 West 1st St
Los Angeles, CA 90012

Dear Honorable Philip Guitierrez,

I am writing to you in regards to Masud Sarshar in hopes that I will be able to shed light on the type of man I have grown up around and am proud to call my uncle.

My name is Nikki Rahimian. I am 20 years old, currently living abroad and studying to earn my Bachelors degree in psychology. My earliest memory of my uncle has to be of the time he brought home his eldest dog for the first time. I clearly recall the excitement my brother and I had running into his apartment and the pure love and joy on his face as he introduced us to his newest companion.

I can confidently say that my uncle Masud is one of the most loyal, generous, caring, kind, and hard-working individuals I know. I grew up watching his continued success as his clothing company expanded. Often times, success is attributed to character changes, but it is with no surprise that to this day, I see that same look of love and joy on my uncles face each time I see him, just as I did on that day so many years ago in his apartment.

I have watched my uncle's unrelenting support for so many of my loved ones including his daughter, 7-year-old son, and my grandmother. I have also never met someone with such a generous heart who is always the first one so many people call in cases of hardship or crisis, because they know he is one to count on.

It saddens me to say that I have seen the way the current proceedings have emotionally and physically affected my uncle, but I have never heard him place the blame of his actions on anyone but himself. He continues to

provide strength for those around him whom have also been affected by his past actions.

I know that my uncle is remorseful of his actions, and I also understand, as does he, the gravity of his actions and the concept of the rule of law.
I ask you to please take into consideration the type of man my uncle is and always has been and with my deepest respect, to please extend to my uncle Masud a measure of compassion.

With my sincerest regards,

*Nikki Rahimian*

Nikki Rahimian

620 Chautauqua Blvd,

Pacific Palisades, CA 90272

310-619-7240

nikkirahimian@yahoo.com

Honorable Philip S. Guitierrez

United States District Judge

350 West 1st Street

Los Angeles, California 90012

Dear Honorable Philip Guitierrez,

My name is Marjan Sarshar. I am a businesswoman, owner of Kreation Organic, mother to two young girls, and sister to Masud Sarshar. Masud was the only boy in a family of 4 sisters. Years ago, my father passed away and Masud stepped up to be that fatherly, protecting, loving, responsible figure in our family.

Masud is an intelligent, caring, loyal, generous man. He is the loving father to two kids, an older daughter and a young boy. I ask you to please consider the effect that a longer sentence would have on my family. It would deeply effect the strong bond that we all have and would definitely leave a big hole in all of our hearts.

I know that Masud has made a mistake, but I also know that he understands the consequences of his actions and is learning from his mistake. Despite his willingness to own up and take responsibility for his mistake, I urge you to think about my family during this time. As a single mother, I know the importance of being there for my children in their most important stages of development, their adolescence. His son, Mio, is merely 7 years old. Masud often takes Mio on ski trips, surf lessons, and tries his best to help his son be active and happy. When Masud and his son come home from a ski trip, his son is always beaming with happiness. Because his sister is so much older than him, he depends on Masud for a strong companionship and looks at Masud as his role model.

Thank you, and I hope you can see how a prolonged incarceration would be detrimental to his family and have compassion on his sentencing.

Sincerely,
Marjan Sarshar
358 11th St
Santa Monica, CA 90402

Deborah Touffer Bergstein

Request for Character Reference Letter for Masud Sarshar

January 30, 2017

Honorable Philip S. Gutierrez
350 West 1st Street
Los Angeles, CA 90012

Hello Honorable Judge Philip S. Gutierrez,

My Name is Deborah Touffer Bergstein and I am a first cousin to Masud Sarshar. I am 43 years old and a mother to two young boys ages six and nine. I hold two masters degrees, one in Healthcare Administration from UCLA and a second one in Nurse Anesthesiology. By profession, I am a Certified Registered Nurse Anesthetist since 2007. My current title is Chief Nurse Anesthetist for a large outpatient surgery center in Los Angeles, where I have managed up to 20 anesthesia providers.

I know Masud my entire life. Our families are very close as I am an only child as my father passed away when I was three years old. Masud's mother is an older sister to my father and therefore we have stayed very close and he is a mentor, a guide, and a role model for me and many others in and around us over the years.

Masud is beyond generous, soft hearted, sensitive, kind, driven, and has helped an endless number of families and individuals over the decades. As immigrants to the United States and as a single mother, my mother worked several jobs to make ends meet and to raise me. Masud provided my mom with full time employment until she was able to find another job and has employed many generations of our family over the years. Without Masud many of our families would be struggling intensely without the ability to pay bills.

He is known for setting stepping stones and allowing individuals to expand their wings and fly independently as he has held many hands and helped pick up pieces. For Masud, there are ups and downs in his life over the decades, however, with each downward fall he has only been stronger and fiercer returning with growth and extreme success as he is known to learn from each experience.

He has helped entire households after illness of a mother from cancer. He employed endless individuals to help jump start lives. He paid for half my first car in order for me to have my own transportation to go to college. He has supported households within his immediate family for many years. He is a father with tremendous patience, love, and tolerance for allowing individual learning and growth.

Many people live in denial. Masud is very realistic and has a way of looking above experiences and moving forward. We are all human. Some of us make mistakes and live with no remorse. But this is not masud. He is all about overcoming barriers, growing, and improving.

I beg you to please reconsider your decision and allow him to show his regret through what he is known for, which is community service. He is a tremendous example for our society in overcoming barriers, learning from mistakes and moving forward in life. Your decision to take him away from the family will be disabling and devastating beyond words. Thank you for your consideration.

Deborah Touffer Bergstein

**Honorable Philip S. Gutierrez**
United States District Judge
350 West 1st Street
Los Angeles, California 90012

Dear Honorable Judge Philip Gutierrez,

My name is Keyvan Rahimian. I am brother-in-law to Masud Sarshar whom I understand has a case to be heard by you soon. Please permit me to shed some understanding on the man whom I admire and honor so much.

Masud Sarshar is a doting uncle to my kids, Nikki and Pasha, and an understanding brother to my wife, Mashid Rahimian. He has given long hours and passion to his work. And still, he would regularly visit and impart on the kids an unbiased insight on how people should fairly treat people, regardless of race, color and gender. He has given us a sense of appreciation of hard work and a responsibility to better our generation and ensure the next generation will do more, if not the same as us.

He has admitted knowledge of his mistakes and has come to terms to never let it happen again. As a man, I can not help but admire him. Most people would have been defeated and content themselves to the mercy and generosity of others but not Masud, not my brother-in-law. I know he eagerly awaits the opportunity to start over. And at that time, it would be different. He would be better. He will not commit the same mistake again.

A passionate hard worker will always be successful.

We only ask that you grant him this opportunity as your office may permit it.

Sincerely,

**Keyvan Rahimian**
620 Chautauqua St.
Pacific Palisades, CA 90272

Gmail Masud Sarshar <sarsharmasud@gmail.com>

# Rabbi Cunin sr

1 message

**Rabbi Levi Cunin** <levicunin@gmail.com> Thu, Feb 9, 2017 at 1:01 PM
Reply-To: levicunin@gmail.com
To: sarsharmasud@gmail.com

B"H

Dear Judge Philip S. Guitierrez,

I am writing to your honor about the upcoming court case regarding Mr. Masud Sarshar.

By way of introduction, my name is Rabbi Boruch S. Cunin and I have served as the director of the West Coast Chabad organization for over 50 years. Chabad is a non-profit Jewish, humanitarian organization, with over 5,000 centers worldwide, including over 200 centers in California. Many of our programs are nonsectarian, including our Drug Rehabilitation Center, which helps those suffering from addiction. In the past 30 years, our center has saved over thousands of lives, ranging from different backgrounds and continues to provide unending emotional and financial support to our clients today.

Many of our clients at our rehabilitation center come from dysfunctional and poverty stricken families and are thus unable to afford their recovery. In order to raise the necessary funds, required to maintain our services at the rehabilitation center, we turn to the community for support. Annually, the Chabad national telethon takes place, serving as our primary fundraiser for the rehabilitation and the programs we run - we enlist the help of many people to open their hearts and donate to our worthy, lifesaving cause.

This, your honor, is why I am writing to you today. Our Talmud teaches us, "**When you save one life, it is as if you have saved the world entire**".

Mr. Sarshar, with his extraordinary generosity has literally saved countless of lives. Over the years he has donated half a million dollars, covering the cost of thousands of scholarships, which has repaired the lives of thousands of families. The long term impact of Mr. Sarshar's generosity is everlasting and we will never be able to repay him for his kindness and compassion. Every child deserves to be raised in a loving and safe environment and thanks to the help of Mr. Sarshar, many children were able to witness the recovery and return of a sober Mum or Dad. Only G-d knows the exponential reach of Mr. Sarshar's benevolence.

Your honor, I know firsthand the sincere regret that Masud feels for his unlawful actions. He has personally shared with me numerous times his feelings of intense shame and remorse. Masud is a unique human being with a kind and compassionate heart. I can honestly affirm that he genuinely cares about the welfare of others and tries his utmost to do whatever he can to help those less fortunate than himself.

I am begging you, to please take into account Masud's philanthropic acts of goodness and kindness.

With much esteem and respect,

Sincerely,

Rabbi Boruch Cunin

B"H

Moshe Cohen
Yeshiva - 2 Bis Avenue du Petit Château, 91800 Brunoy, France

February 10 2017

Honorable Philip S. Guitierrez
United States District Judge
350 West 1st Street
Los Angeles, California 90012

Dear Judge Philip S. Guitierrez,

I hope this letter finds you in the best of health and spirits. If I may please take a moment of Your Honor's time to write to you on behalf of Mr. MasudSarshar. As a young student, studying in a Jewish institution, Mr. Sarshar made a tremendously positive impression on me. He is a unique and kind man who was a great source of inspiration to many of us, in fact, I remember thinking to myself "When I grow up, I want to be like Masud."

Mr Sarshar was truly a beacon of light and renowned for opening up his heart and home to the community. I will never forget how excited I was when he would invite our entire class to his home, to celebrate festivals and holidays. Mr Sarshar would generously sponsor many events, from Chanukah parties to hosting BBQ's for the entire high school in celebration of the Jewish holidays. We were always made to feel welcome and comfortable in his home and he treated each student with the utmost respect and love. His genuine care and the individual attention he gave to us, inspires me to this day.

High school can be a challenging time, many of the students in my class came from impoverished struggling families. Mr Sarshar took special interest in these kids and would make sure to give them extra attention and support, asking about their lives and worrying about their welfare.

His willingness to financially and emotionally support students in need, is something to never be forgotten. As a result of the immeasurable, countless acts of generosity and kindness, may I humbly appeal to you that that this be taken into account in his favor whilst considering his sentencing.

Thank you so very much for your time and consideration.

Sincerely,
משה כהן הכהן
Moshe Cohen
Yeshiva student, France.

**Friends of Lubavitch Inc. · Chabad House** ב"ה

741 Gayley Avenue · Los Angeles, California 90024 (213) 208-7511

February 8, 2017

To Your Honorable Judge,

I have known Mr. Masud Sarshar for the past 30 years as honorable, helpful and caring person.
He has been very helpful in supporting our homeless and children's program.

I personally have approached him on many occasions to help the widows, the orphans and the needy families who would like to get married and have no found available. He has been extremely generous in financial help and organizing for their needs.

Whenever we needed anybody to volunteer to help the children's school he has been accommodating as always.

Whatever you do for Mr. Masud Sarshar will be greatly appreciated as he is loved and very much respected in our community.

Thank you very much in advance. For your close cooperation. For further information, please do not hesitate to call me directly at 213-910-1700.

Respectfully Yours,

Rabbi David Kesherim
Board of Director of Chabad of California